UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NORMA EZELL, LEONARD WHITLEY, and ERICA BIDDINGS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEXINGTON INSURANCE COMPANY; AMERICAN INTERNATIONAL GROUP, INC.; AIG ASSURANCE COMPANY; AIG PROPERTY CASUALTY COMPANY; AIG SPECIALTY INSURANCE COMPANY; AMERICAN GENERAL LIFE INSUR-ANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTS-BURGH, PA.; AGC LIFE INSURANCE COMPANY; AMERICAN GENERAL ANNUITY SERVICE CORPORATION; AIG DOMESTIC CLAIMS, INC.; their predecessors and successors, and other affiliated legal entities to be named,<br><br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    JURISDICTION ....................................................................................2

III.   VENUE .................................................................................................2

IV.   PLAINTIFFS, DEFENDANTS, AND NON-PARTY PARTICIPANTS IN THE RACKETEERING ENTERPRISE ..........................................................2

     A.     Plaintiffs .......................................................................................2

     B.     Defendants and Their Role in the Scheme ................................................4

     C.     Unnamed Members of the RICO Enterprise: the AIG-Approved Agency Partners and Their Role in the Scheme ...................................................7

V.     NATURE OF THE CLAIMS .............................................................11

     A.     Structured Settlement Arrangements ....................................................11

     B.     The Structured Settlement Market .......................................................13

     C.     AIG's Structured Settlement Process: Reducing the Value of Claimants' Settlements through Hidden Payment of AIG's Own Defense Brokerage Fees ...........................................................................................15

     D.     The Named Plaintiffs' Settlements .......................................................19

         1.     Norma Ezell ........................................................................19

         2.     Leonard M. Whitley, Jr. ..........................................................22

         3.     Erica Biddings (formerly Erica Major) .........................................25

     E.     Common Course of Conduct and Injury Allegations ..................................30

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ..............................33

     A.     Discovery Rule Tolling .....................................................................33

     B.     Fraudulent Concealment Tolling .........................................................34

VII.   CLASS ACTION ALLEGATIONS ....................................................34

VIII.   CAUSES OF ACTION .....................................................................37

COUNT I  VIOLATION OF RACKETEER INFLUENCED AND CORRUPT
      ORGANIZATIONS ACT, 18 U.S.C. § 1962(C) AND 18 U.S.C. § 1962(D)
      (AGAINST ALL DEFENDANTS) ...................................................................37

      A.     The Racketeering Enterprise.................................................................37

      B.     Racketeering Activity and Predicate Acts ...........................................38

      C.     Causation..............................................................................................45

      D.     Violation of 18 U.S.C. § 1962(d)..........................................................46

COUNT II  FRAUD, FRAUDULENT CONCEALMENT, FRAUD IN THE
      INDUCEMENT, AND CONSPIRACY TO DEFRAUD  (AGAINST ALL
      DEFENDANTS)............................................................................................47

COUNT III  UNJUST ENRICHMENT  (AGAINST AIG PARENT ONLY).............................48

REQUEST FOR RELIEF ..........................................................................................48

JURY DEMAND ......................................................................................................49

## I.      INTRODUCTION

Plaintiffs Norma Ezell, Leonard Whitley, and Erica Biddings bring this action on behalf of themselves and others who resolved personal physical injury claims or workers' compensation claims, where the settlement included a "structured settlement," which provides future periodic payments funded with an annuity. In 2015, defendant American General Life Insurance Company alone accounted for 11% of the $5,347,578,153 in annuity sales reported by the structured-settlement industry. Defendants defrauded Plaintiffs and the Class by secretly deducting four percent from the cash portion of the settlement that the settling parties agreed would fund future annuity payments, and retaining that four percent for themselves or to pay commissions to defense brokers.[1] By secretly and unlawfully diverting settlement money to pay their structured-settlement specialists and unjustly enrich themselves, Defendants both avoided the cost of this defense expense and significantly decreased the amounts they promised to pay to fund future annuity payments to the settling claimants, who are the class plaintiffs in this action.

---

[1] The structured-settlement community commonly but inappropriately refers to its producers as brokers. Most structured-settlement specialists are licensed life insurance agents who are appointed by the life insurance companies that offer annuities to fund periodic payments. The agents' statutory duty is to the companies that appointed them. Conversely, a broker holds a broker's license and typically is not appointed by the company. A broker's duty is to the consumer. Therefore, use of the term *broker* is misleading in this context, as it signals a false duty of loyalty to the unsuspecting consumer. This Complaint and succeeding pleadings will follow the industry's vernacular and reluctantly use the term *broker*. While a producer may hold a life insurance agent's license, that person is not an agent of the appointing life insurance company when there is no authority to bind the company when writing an annuity application. This is an important distinction when considering the relationship of structured-settlement producers to the annuity issuers as an association-in-fact in defining a racketeering "enterprise" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), at 18 U.S.C. § 1961(4).

## II.      JURISDICTION

1.       This Court has jurisdiction under 28 U.S.C. § 1331, as the claims arise under the laws of the United States, and under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005.

2.       The matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action involving substantially more than 100 class members, of which fewer than one-third are citizens of Massachusetts.

## III.     VENUE

3.       Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant Lexington Insurance Company ("Lexington"), which has its principal place of business in Boston, Massachusetts, approved and issued in this District insurance policies that were at issue in underlying claims by each Plaintiff in this action, which led to the causes of action alleged by Plaintiffs in this action against Lexington and other Defendants, and also approved in this District the settlements of Plaintiffs' underlying claims.

## IV.     PLAINTIFFS, DEFENDANTS, AND NON-PARTY PARTICIPANTS IN THE RACKETEERING ENTERPRISE

### A.      Plaintiffs

4.       Plaintiff Norma Ezell, who resides in Aberdeen, Mississippi, compromised wrongful death claims individually and as Administratrix of the Estate of Odessa Ware (her aunt) against a nursing home insured by defendant Lexington, at a mediation in Tupelo, Mississippi, on April 22, 2003. In the process of settling her claims, she was defrauded by an elaborate

scheme coordinated by defendant AIG[2] in collaboration with "Agency Partners" and structured-settlement brokers, through an association-in-fact that was a racketeering enterprise as defined in RICO, 18 U.S.C. § 1961(4). She brings this action on behalf of herself and all others similarly situated against all Defendants for participating in that scheme.

5.     Plaintiff Leonard M. Whitley, Jr., who is the brother of plaintiff Norma Ezell and also resides in Aberdeen, Mississippi, compromised wrongful death claims individually and as an heir of the Estate of Odessa Ware, his aunt, against a nursing home insured by defendant Lexington, at a mediation in Tupelo, Mississippi, on April 22, 2003. In the process of settling his claims, he was defrauded by an elaborate scheme perpetrated and coordinated by defendant AIG in collaboration with "Agency Partners" and structured-settlement brokers, through an association-in-fact that was a racketeering enterprise as defined in RICO, 18 U.S.C. § 1961(4). He brings this action on behalf of himself and all others similarly situated against all Defendants for participating in that scheme.

6.     Plaintiff Erica Biddings (formerly Erica Major), who resides in Southwest Ranches, Florida, compromised wrongful death and personal injury claims individually and as Personal Representative of the Estate of Roddy Major (her husband) against Bull Motors, LLC, which was doing business as Maroone Ford of Miami and which was insured by AIG's Lexington Insurance Company, resulting in a Settlement Agreement and Release dated August 13, 2009. Erica had sought to recover monetary damages as a result of a motor vehicle accident on December 7, 2003, in Palm Beach County, Florida, which caused the death of Roddy Major and personal physical injuries to herself as a passenger. Defendant Lexington Insurance Company was the liability insurer. In the process of settling her claims, she was defrauded by an

---

[2] Throughout this Complaint, the term "AIG" refers collectively to American International Group, Inc., and its subsidiaries, unless the context otherwise requires.

elaborate scheme perpetrated and coordinated by defendant AIG in collaboration with "Agency Partners" and structured-settlement brokers, through an association-in-fact that was a racketeering enterprise as defined in RICO, 18 U.S.C. § 1961(4). She brings this action on behalf of herself and all others similarly situated against all Defendants for participating in that scheme.

**B.      Defendants and Their Role in the Scheme**

7.      Defendant Lexington is a Delaware corporation with its principal place of business in Boston, Massachusetts. As set forth above, Lexington insured the nursing home against which named Plaintiffs Norma Ezell and Leonard M. Whitley, Jr., made claims for wrongful death, and insured Bull Motors, LLC, against which named Plaintiff Erica Biddings made wrongful death and personal injury claims. Lexington approved and issued in the District of Massachusetts the insurance policies for the nursing home and Bull Motors, LLC. And as alleged above, Lexington participated in the wrongful scheme that defrauded all three Plaintiffs.

8.      Defendant American International Group, Inc., a Delaware corporation, is a leading international insurance organization. Its principal executive offices are at 175 Water Street, New York, NY 10038. AIG companies serve commercial, institutional, and individual customers through one of the most extensive worldwide property-casualty and liability networks of any insurer. In addition, AIG companies are leading providers of life insurance and retirement services in the United States. In this Complaint, "AIG" refers collectively to AIG and its subsidiaries, unless the context otherwise requires, and "AIG Parent" refers solely to American International Group, Inc., and not to any of its subsidiaries.

9.      All remaining Defendants are subsidiaries of AIG Parent. AIG changed the alignment of its financial reporting in 2011 to be consistent with how its chief operating decision makers review the business to allocate resources and assess performance. This realignment resulted in four major subsidiaries for reporting operations, including Chartis, Inc. ("Chartis").

10. Defendant AIG P&C, which briefly was known as Chartis, is a subsidiary of AIG Parent and a world-leading property-casualty and general insurance organization serving more than 45 million clients in over 160 countries, offering a breadth of insurance products and services to businesses and individuals. It is a Pennsylvania corporation with its executive offices at 175 Water Street, New York, NY 10038. On July 29, 2009, some AIG P&C entities were given the Chartis brand as part of a reorganization due to the federal bailout of AIG as a beneficiary of the Troubled Asset Relief Program ("TARP"), a program of the United States government to purchase toxic assets and equity from financial institutions. This rebranding maneuver was designed to combat lost sales due to the stigma attached to the AIG brand at that time. An industry publication, *Insurance Journal*, reported in its June 28, 2012 issue that, according to AIG Chief Executive Bob Benmosche, Chartis-named entities would revert to their previous names "in a move to recognize the company's turnaround."

11. AIG P&C conducts its business through many subsidiaries, including defendants Lexington, AIG Assurance Company ("AIG Assurance"), AIG Specialty Insurance Company ("AIG Specialty"), and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), all of which provide property and casualty insurance services and all of which participated in settlements that resulted in the wrongful losses suffered by Plaintiffs and Class members.

12. AIG Assurance is a Pennsylvania corporation with its principal place of business in New York, New York. AIG Specialty is an Illinois corporation with its principal place of business in New York, New York. National Union Fire Insurance Company of Pittsburgh, Pa., is a Pennsylvania corporation with its principal place of business in New York, New York.

010654-11 921383 V1

13. Defendant AGC Life Insurance Company ("AGC Life") is a Missouri corporation with its principal place of business at 222 Monroe Street, Jefferson City, Missouri 65101. AGC Life is a holding company. Through its subsidiaries, AGC Life offers life and general insurance products.

14. Defendant American General Life Insurance Company ("American General") is a Texas corporation with its principal executive office in Houston, Texas. American General is a subsidiary of AGC Life. American General markets and sells an array of insurance products, including structured settlements that are distributed through structured-settlement brokers. American General's website boasts that it is an industry leader in structured settlements, as one of the first companies to write structured settlements and having written more premium than any other company. American General has reported on its website that it provides customer service to more than 60,000 structured settlement annuitants annually. In August 2001, AIG acquired American General for $23 billion of AIG stock.

15. It is believed that defendant American General Annuity Service Corporation, which is a subsidiary of American General, is a shell company whose exclusive role is to assume periodic payment obligations under qualified assignments made pursuant to 26 U.S.C. § 130(c) and to own American General annuities as the funding assets. American General Annuity Service Corporation is a Texas corporation, with its principal place of business in Houston, Texas. This business unit is currently headed by Mike Wostoupal, Vice President of Structured Settlements for American General Life Companies.[3] Bobby Steele was his predecessor for much of the period relevant to this Complaint.

---

[3] The website for American General Life Companies states that it "is the marketing name for the insurance companies and affiliates comprising the domestic life operations of American International Group, Inc., including: American General Life Insurance Company, Houston, TX

16.     Defendant AIG Domestic Claims, Inc. is a Delaware corporation with its principal place of business in New York, New York.

17.     Based on knowledge of the industry, it is believed that the AIG business units named as defendants have participated in the unlawful scheme alleged in this Complaint. Plaintiffs will seek leave of Court to amend this Complaint, stating names and appropriate charging allegations of other business units when the nature of their involvement can be confirmed. Regardless of the current organizational structure, the reorganizations, name changes, and other events that make tracing the actions of the individual AIG property-casualty-liability-related entities difficult, the scheme detailed in this Complaint has resulted and continues to result in ill-gotten gains reflected in the bottom line of AIG's financial statements.

## C.     Unnamed Members of the RICO Enterprise: the AIG-Approved Agency Partners and Their Role in the Scheme

18.     Defendant AIG P&C maintains an Approved Broker List of those appointed by American General to sell annuities for structured settlements. This is a more restrictive list than the American General list of appointed brokers. Those on the AIG Approved Broker List are known as "Agency Partners" and are given access to pending claims for personal physical injury, personal physical sickness and workers' compensation liability, and are allowed to work with AIG claims adjusters and defense counsel to resolve those claims by presenting annuity illustrations and their tax advantages to claimants in conjunction with offers to settle. During a period relevant to this action, the entity that controlled the Approved Broker List before the 2009 internal reshuffling of lines of reporting, divestments, and name changes was AIG Domestic Claims,

---

[and] The United States Life Insurance Company in the City of New York (USL), New York, NY." http://www.aglife.com/lifeinternet2000/structured.nsf/contents/Legal_Notice (last visited on December 20, 2016).

Inc., Structured Settlement Department, located at 70 Pine Street, 7th Floor, New York, NY 10270. It was headed by Ismael Acevedo. It is now headed by Kathy Martin. It is believed that this operation continues and is unchanged, except perhaps for a change of name and lines of reporting.

19.     Approved Brokers are protected as much as possible from competition by brokers who are not on the AIG Approved Broker List. In exchange for the often lucrative commission bundled into the cost or present value of an American General or other AIG-affiliated annuity contract, Approved Brokers are expected to pay their own expenses of attending mediations and settlement conferences, and to present illustrations that take advantage of the time value of money and make the amount of money that the AIG property and casualty or liability insurance company proposes to spend on the future payments appear to be a much higher amount than it actually is. Sometimes the cost or present value of the annuity is not divulged when the presentation is made. (The American General software has a "plaintiff version" illustration that hides the premium amount.) But the purported cost or present value of the future annuity payments is almost always disclosed at some point during the settlement process, especially if a claimant is represented by legal counsel, who is entitled to an attorney's fee based on the total recovery, including cash paid at the time of settlement plus the purported cost or present value of the periodic payments.

20.     Brokers were placed on the AIG Approved Broker List by virtue of their affiliation with certain structured settlement brokerage companies chosen by Ismael Acevedo, head of the AIG structured settlement program during much of the time relevant to this Complaint, by any of his predecessors, or by his successor, Kathy Martin. Generally, each brokerage is a general insurance agency comprising licensed life insurance agents who are appointed by various

life insurance companies, including American General, to sell their structured settlement annuity products and arrange at times for their assumption of the structured settlement payment obligations under "qualified assignments" within the meaning of 26 U.S.C. § 130(c). The named brokerages listed below and the individual brokers affiliated with them are not defendants in this action, but they form the association-in-fact with AIG entities (including, but not limited to AIG P&C subordinates and American General) to compose the racketeering enterprise. The list is not necessarily complete, but it demonstrates the pervasiveness of the pattern of racketeering activity within the enterprise operated by AIG business entities to defraud tens of thousands of claimants since the current AIG structured settlement program began, by a pattern of predicate acts of mail fraud and wire fraud in violation of RICO.

21.     American General maintains tight control over who it appoints to market its structured settlement product, which includes its single-premium immediate annuities and the ability to transfer the obligation to make periodic payments to its AIG affiliate, American General Annuity Service, which accepts these obligations to make periodic payments and purchases from American General and owns the annuity contracts that fund these obligations. But being a licensed life insurance agent appointed to market American General annuities does not also come with the authority to bind American General to coverage, as only American General can do that. Thus, these appointed annuity brokers are not agents of AIG or any of its subordinates, including American General. Being appointed by American General is simply a prerequisite to being named to the AIG Approved Broker List.

22.     At all times mentioned herein, the AIG Approved Brokers had no authority to bind AIG but instead were restricted to selling a structured settlement, making the presentation of annuity illustrations, drafting the settlement documents to reflect the periodic payments using

standardized forms, filling out the annuity application form, or submitting a check to the annuity

issuer in payment of annuity premium. These annuity brokers are appointed by AIG and have

associated with AIG to form a racketeering enterprise as defined in RICO, 18 U.S.C. § 1961(4).

This association-in-fact has defrauded Plaintiffs and members of the proposed Class.

   23. The following brokerages, known as "Agency Partners," have been on the AIG

Approved Broker List within periods relevant to this Complaint, and are part of the racketeering

enterprise at issue; they are listed along with their corporate headquarters address. The list

includes but is not necessarily limited to: American Settlement Corporation, 6445 Powers Ferry

Road, Suite 195, Atlanta, GA 30339; Atlas Settlement Group, One Piedmont Center, Suite 525,

3565 Piedmont Road NE, Atlanta, GA 30305; Black, Holcomb, Smith and Associates, Inc., 2870

East Oakland Park Boulevard, Fort Lauderdale, FL 33306; Bradford Settlement Company, 161

North Clark, Suite 2925, Chicago, IL 60601; Brant Hickey & Associates, 1810 Mt. Nebo Road,

Sewickley, PA 15143; Bridge Settlement Group, P.O. Box 538, Hatboro, PA 19040; Galaher

Settlements & Insurance Services, Inc. (formerly known as Cambridge Galaher Settlements &

Insurance Services, Inc.), 1100 Ridgeway Loop Road, Memphis, TN 38120; Capital Planning,

Inc., 2051 Killebrew Drive, Suite 640, Bloomington, MN 55425; Creative Capital, 1200 Tices

Lane, Suite 102, East Brunswick, NJ 08816; EPS Settlements Group, Inc., 5613 DTC Parkway,

Suite 600, Greenwood Village, CO 80111; James E. Logan & Associates, Ltd., 27750

Middlebelt Road, #100, Farmington Hills, MI 48334; JMW Settlements, 1130 Connecticut

Avenue NW, Suite 540, Washington, DC 20036; Kipnes Crowley Group, 50 Main Street, Suite

825, White Plains, NY 10606; The Mangelsdorf Companies, 6340 Meadow Road, Suite 142,

Dallas, TX 75231; Mesirow Financial, 353 North Clark Street, Chicago, IL 60654; Millennium

Settlements, 3060 Peachtree Road NW, Suite 225, Atlanta, GA 30305; NFP Structured

Settlements (formerly National Settlement Consultants), 55 Public Square, Suite 2050, Cleveland, OH 44113; The Pension Company, P.O. Box 160, Bryn Mawr, PA 19010; Preferred Settlements, 9709 Pallisers Terrace, Suite 200, Charlotte, NC 28210; Ringler Associates, Inc., 27422 Aliso Creek Road, Suite 200, Aliso Viejo, CA 92656; Selective Settlements, 1776 Legacy Circle, Suite 104, Naperville, IL 60563; Structured Financial Associates, 3060 Peachtree Road NW, Suite 225, Atlanta, GA 30305; Summit Structured Settlements (formerly Summit Settlement Service), 755 SE Frontier, Suite 101, Waukee, IA 50263; Superior Settlements, 2000 Polaris Parkway, Columbus, OH 43240; and Thomas J. Faulhaber & Associates, Inc., 5908 Amy Drive, Edina, MN 55436. This may not be a complete list of those who have ever been an Agency Partner. These Agency Partners (past and present) are not part of AIG or named Defendants in this action but are part of the racketeering enterprise at issue.

## V.    NATURE OF THE CLAIMS

### A.    Structured Settlement Arrangements

24.    A structured settlement arrangement generally provides for periodic payments for damages in cases for personal physical injuries or physical sickness, 26 U.S.C. § 104(a)(2), or for amounts received under workers' compensation acts, under 26 U.S.C. § 104(a)(1).

25.    The Periodic Payment Settlement Tax Act of 1982 ("Settlement Act") provides tax-favored treatment for payments under structured settlement arrangements. By amending Section 104, the Settlement Act allows an injury claimant to exclude from gross income future "periodic payments," as long as the injury claimant does not take actual or constructive receipt of or have economic benefit of the cash, annuity, or U.S. obligation funding the payments. The exclusion from gross income is provided generally for the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness.

26.     The periodic payments under a structured settlement may be self-funded by the liability insurer from the insurer's own cash flow or by the purchase of an asset, usually an annuity, which remains an asset of the liability insurer. Alternatively, the liability insurer may pay a lump sum consideration to a third-party assignee (who is usually a third-party entity affiliated with the life insurance company that will issue the annuity) to assume the periodic payment liability to the claimant (a "qualified assignment"). A qualified assignment is defined and authorized under 26 U.S.C. § 130, as created by the Settlement Act.

27.     In cases where the liability insurer transfers the duty to another entity to make annuity-funded periodic payment of damages or workers' compensation benefits, the Settlement Act gives the third-party assignee an exclusion from gross income for amounts received for agreeing to a "qualified assignment," but only to the extent the amount received does not exceed the aggregate cost of the annuity. The liability insurer that makes the "qualified assignment" is allowed a current-year tax deduction for the whole amount it paid for the settlement, including any cash at the time of the settlement and the annuity's purchase price (or cost).

28.     In a structured settlement transaction, the purchaser and owner of the annuity contract is not the structured settlement payee but rather a self-insured defendant, a liability carrier for a defendant, or the third-party assignee to whom a periodic payment obligation has been transferred.

29.     Annuity business is lucrative for insurance companies. There is a legitimate "spread" between the anticipated cost of making the long-term periodic and deferred lump sum payments required by the annuity contract and what the company charges for the contract. And there are other legitimate benefits to the parent company's bottom line when settlement dollars are retained by funding a claim settlement with an annuity from a related company. But it is

fraudulent for an annuity issuer to secretly conceal additional amounts bundled with the annuity premium that exceed the present value of future dollars, a legitimate profit margin, mortality cost, and legitimate administrative expense. The undisclosed 4% commission paid to AIG's consultants—the Approved Brokers—is an act of fraud when it secretly reduces the amount of money the claimant was told would be invested in future payments. Thus, for every $1,000 paid on behalf of a claimant for future benefits under a settlement agreement, that amount should be $1,041.67. (Divide 1.0 by 0.96 to obtain the factor, 1.04167.) Obviously, this short-changing is enhanced when AIG secretly holds back for its own benefit hidden charges, such as additional marketing costs and the like, that are bundled into the annuity pricing. Subject to evidence adduced in discovery, Plaintiffs will seek leave of Court to amend this Complaint to identify an expanded degree of fraud being committed by Defendants.

**B.      The Structured Settlement Market**

30.      In 2002, the first full year that American General (which was acquired by AIG in 2001) became a major player as a provider of structured settlement annuities, there were 22 life insurance companies competing for a share of the market. AIG's American General, combined with the premium paid into AI Life (which is the AIG life insurance company licensed in New York), accounted for 19% of all premium dollars paid to the 22 companies ($6,142,000,000). Today, fewer than eight life insurance companies offer structured settlement annuities to liability insurers and self-insured corporations to indemnify victims of personal physical injury and workers' compensation claimants. American General accounted for 11% of the $5,347,578,153 in annuity sales reported by the industry in 2015. In addition, many of these life insurance companies, like American General, have affiliated property and casualty companies to which they sell annuities to help settle their sister carrier's liability claims through structured settlements. These life insurance companies generally do not restrict their products from being

sold based on whether the broker was engaged by the defense or by the claimant. Most insurance companies, like AIG, that operate jointly affiliated liability and life companies restrict access to their own claims settlement annuity sales opportunities to a select list of approved outside defense brokers or in-house brokers. Recently, AIG seems to have purged its list of brokers appointed to sell American General and USL annuities who are not also a member of an Agency Partner brokerage.

31.     Industrywide, structured settlement brokers are paid a standard sales commission of four percent (4%) of the annuity's cost, whether they are oriented to the defense or plaintiff in their marketing. Plaintiff-oriented brokers have a duty of loyalty to the plaintiff. Defense-oriented brokers provide services that typically include working with the liability insurer's claims adjusters, preparing form structured settlement documents, and relaying information to the claimant on behalf of the defense insurer about the annuity proposal. Thus, structured settlements can be used as a device offered and arranged by liability insurers on behalf of the defense, whereby the liability insurer and broker operate in tandem to deliberately erect an information barrier to protect the defense interests. For example, liability insurers typically do not reveal to tort claimants or workers' compensation claimants (or their attorneys) any information about the commission agreements they have with their appointed brokers.

32.     A significant percentage of structured settlements involve small claims in which the claimant lacks knowledge about these sophisticated transactions and is not represented by an attorney. The vast majority of structured settlements occur without the claimant retaining a broker.

33.     According to data reported on behalf of the National Structured Settlements Trade Association (NSSTA), AIG life insurance companies led the industry in structured settlement

- 14 -

annuity sales from 2002 through 2008. The AIG figures below represent the combined sales (in millions of U.S. dollars) of American General Life Insurance and either AI Life, through 2010, or USL, beginning in 2011 through 2015, compared with the aggregate figure of all life insurance companies that belong to NSSTA. (The figures are rounded.) The share of AIG's annuity premium sold is as a percentage of the NSSTA figure. The severe reduction in share from 2008 (23%) to 2009 (8%) is widely considered to be a result of AIG's lowered ratings by the independent analysts due to its bailout as part of TARP, which was initiated in 2008. It was during this period that AIG evidently loosened its policy of strong-arming settling injury victims into agreeing to allow AIG annuities to fund future payments. It has since resumed the practice. The following table shows the annual structured settlement annuity premium production, in millions of U.S. dollars, by AIG life insurance companies as compared to all life insurance companies that are members of the National Structured Settlements Trade Association (NSSTA), which includes AIG. The majority of the AIG premium was received by American General, which AIG acquired in August 2001. The AIG premium amount is combined with AIG's AI Life, which issued annuities in New York, through 2001. Beginning in 2002, that premium is combined with U.S. Life, which now issues structured settlement annuities for New York cases.

| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|-------|
| AIG | 1,179 | 1,195 | 1,221 | 1,316 | 1,463 | 1,468 | 1,454 | 429 | 499 | 544 | 526 | 587 | 477 | 612 | 12,970 |
| NSSTA | 6,142 | 5,965 | 6,135 | 6,125 | 6,112 | 5,998 | 6,227 | 5,384 | 5,524 | 4,975 | 4,819 | 5,134 | 5,250 | 5,348 | 79,138 |
| Share | 19% | 20% | 20% | 21% | 24% | 24% | 23% | 8% | 9% | 11% | 11% | 11% | 9% | 11% | 16% |

**C.    AIG's Structured Settlement Process: Reducing the Value of Claimants' Settlements through Hidden Payment of AIG's Own Defense Brokerage Fees**

34.    AIG and its Approved Brokers (and In-House Brokers) have gone much further than merely keeping confidential certain fee and other strategic information as a means to

preserve the structured settlement concept as a defense tool. Rather, AIG and its Approved

Brokers (and In-House Brokers) have colluded to submit falsely inflated cost information to

unwitting tort and workers' compensation claimants (and their attorneys when retained) about

the true amount of money that the AIG liability insurer invests to purchase the funding annuity.

35.     As occurred with the named Plaintiffs, it is the practice of AIG and its Approved

Brokers (and In-House Brokers) not to disclose to injury claimants that the brokerage fee, which

is owed to the broker by the AIG annuity company, is recovered from the claimant's previously

agreed-upon settlement proceeds by secretly bundling the broker's 4% commission into the

represented annuity cost. Nor does AIG reveal that, even if a portion of this 4% "built-in

commission" is not paid to the Approved Broker or In-House Broker for whatever reason, it is

kept by AIG for itself.

36.     In order to make injury claimants pay the annuity brokerage commission, it is

AIG's practice not to disclose to any settlement claimant (and, in fact, it affirmatively conceals

by misrepresentation) the exact amount that it subsequently invests to purchase the annuity that

the settling parties agreed should be acquired. And AIG uses a structured settlement annuity

software and quoting system that is represented by it and the Approved Brokers (and In-House

Brokers) as illustrating future projected payments based on the amount of funds previously

agreed between the settling parties to be invested in the annuity. But this representation is not

true, because it does not reflect the commission that is paid to the broker, which is hidden in the

cost or present value of the annuity communicated to the claimant or claimant's attorney.

37.     Contrary to AIG's representations to injury claimants and their attorneys, the

structured settlement annuity and quoting system utilized by AIG has been intentionally designed

to include the broker's commission as a part of the premium charge for the annuity. Since this

- 16 -

defense-owed cost is "bundled in," injury claimants (and their attorneys when retained) are typically unaware that the AIG company actually fails to remit to them, and in fact diverts, this portion of their agreed-upon settlement proceeds to pay the broker's commission instead of investing it in funding the future payments.

38.     This annuity software and quoting system is used by AIG and its Approved Brokers or In-House Brokers with injury claimants (and their attorneys when retained) in connection with each settlement transaction. It is AIG's practice (and the practice of its Approved Brokers or In-House Brokers) not to disclose (and even affirmatively to conceal) that the annuity illustrations which are presented for acceptance to injury claimants (and their attorneys when retained) do not reflect the true value of the investment in these annuities because of Defendants' undisclosed "built-in" commission amounts which are diverted by AIG to its Approved Brokers or In-House Brokers as cost avoidance or kept for itself as a direct annuity investment reduction.

39.     In fact, AIG trains its employees in the Structured Settlement Program, as well as its Approved Brokers and In-House Brokers, not to disclose to claimants (or their attorneys when retained) the fact that the broker's fee is bundled into the represented annuity investment cost.

40.     AIG's employees, its Approved Brokers, and In-House Brokers are also trained to conceal this scheme, in the event of claimant inquiries about the payment of commissions, by avoiding a direct answer to the question or, sometimes, by indicating that payment of annuity premiums from the defendant's AIG-affiliated liability insurer to American General avoids commission as a cost to claimant. Failure to disclose the payment of commissions from an annuity's cost or present value, which is the gravamen of the causes of action detailed in this Complaint, constitutes fraud when the settling claimant is led to believe and rely to his or her

detriment that all of the represented cost or present value is being applied to purchase future payments for the claimant's benefit.

41.     The AIG Approved Brokers are also required to fund periodic payments with an American General or other AIG-related annuity, if at all possible. This requirement is called the "first and last right of refusal." Based on knowledge and belief, AIG has instructed its Approved Brokers to make all offers to settle cases in the form of a structured settlement. Also based on knowledge and belief, AIG has instructed, encouraged, or permitted its AIG P&C claims adjust-ors to condition a claimant's opportunity to use a structured settlement upon (i) using American General as the annuity issuer, and (ii) using an AIG Approved Broker to furnish annuity quotes and/or act as broker/agent for purchase of the annuity contract issued by American General. AIG's goal is to retain its liability claim settlement dollars by directing them to American General or other AIG-related annuities. Brokers have been instructed to show the AIG annuity product first; unless compelled by the plaintiff to illustrate competitiveness, the broker need not canvass the approved list of annuity markets for the best quote.

42.     AIG vigorously strives to recapture settlement dollars in physical injury cases by using hardline negotiation tactics to encourage the purchase of an American General annuity as part of the settlement terms. Consequently, the majority of settlements by AIG P&C in cases with structured settlements are funded with American General annuities. American General is a major player in the racketeering enterprise, as they conspire with AIG P&C to control which brokers get appointed to sell American General structured settlement annuities. Thus, they are a named defendant in this action. However, settling claimants are also victimized when annuities are purchased from a non-AIG life insurance company, as the practice of secretly using the commission for AIG's benefit is the same. Therefore, the class includes claimants who settled

- 18 -

with an AIG P&C company and whose annuity is from a non-AIG-brand company, as well as those claimants whose annuity was issued by American General, AI Life, or USL.

**D.    The Named Plaintiffs' Settlements**

**1.    Norma Ezell**

43.    Plaintiff Norma Ezell, a resident of Aberdeen, Mississippi, compromised wrongful death claims individually and as Administratrix of the Estate of Odessa Ware, her aunt, against Community Eldercare Services, L.L.C., and CLC of West Point, L.L.C., at a mediation by Richard M. Strauss, Esq., in Tupelo, Mississippi, on April 22, 2003, accompanied by her brother, Leonard M. Whitley, Jr., as plaintiffs. Also at the mediation were their attorney, J.P. Sawyer, a representative (name illegible) of Community Eldercare Services, the defendant (Tom Senderhauf), a technical services claims analyst who signed on behalf of AIG (as liability insurer for the Defendant), and another person (name illegible), presumably the defense counsel. Normal Ezell is no longer a client of J.P. Sawyer or his firm, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

44.    The terms of the "Settlement Memorandum" included payment of a cash amount plus $200,000 "to be annuitized." She and her brother, Leonard M. Whitley, Jr., agreed each would be allocated $100,000 to fund a structured settlement that would provide periodic payments in equal amounts and on identical dates. The annuity to fund the future payments to Norma Ezell was issued by AIG's American General Life Insurance Company, dated May 6, 2003, to AIG's American General Annuity Service Corporation as its owner, which had accepted the defendant's obligation to make 40 equal periodic payments of a specified amount, beginning June 15, 2023, under a "qualified assignment" within the meaning of 26 U.S.C. § 130. Payments were guaranteed by AGC Life Insurance Company under a Corporate Guarantee. The single premium annuity policy (Contract Number 412132), was "signed at the home office on the date

of issue" by American General Life Insurance Company's secretary and its president (signatures illegible). The annuity policy's schedule page represented its cost to be "$10.00 and other valuable consideration," a deceptive act intended to obfuscate the true cost to AIG P&C of the annuity, avoiding disclosure through an elaborate scheme of fraud to be described herein, perpetrated by a racketeering enterprise coordinated by AIG P&C, that its cost was less than her half of the $200,000 amount its claims representative had promised at the mediation, as reflected in the Settlement Memorandum.

45.     Norma Ezell was unaware that the amount promised by AIG to go toward her future payments included a commission that would be paid to someone rewarded by AIG for working on behalf of AIG to settle the claim against one of its subsidiary insurance companies. Norma did not know that all or part of 4% of the $100,000 annuity premium—the sum of $4,000—was to be paid to the AIG Approved Broker, Jim Beatty, through an elaborate market-ing system where others shared in the ill-gotten gains, including Beatty's agency (EPS Settle-ments) and perhaps even AIG's In-House agency. None of those who shared in that commission acted for her benefit. All participants who received part of the commission were loyal to AIG P&C—not to Norma. AIG had led her to expect the benefit of the entire $100,000 in future payments from the annuity in exchange for compromising her claims against Lexington's insured tortfeasor. Instead, she received the benefit of only $96,000 as a result of AIG's fraudulent scheme. She was cheated out of $4,000. The amount paid by AIG to the AIG Approved Broker (whatever was left of the $4,000 after anything AIG may have kept for itself) was a cost of litigation that should have been borne by AIG, not Norma. Instead, AIG induced Norma to compromise her claims by accepting a promise of future payments having a specified cost or present value—an amount that included money AIG secretly intended to use to pay its own

consultant. Norma first learned of this scheme of fraudulent concealment on November 11, 2015, when she met in Tupelo, Mississippi, with Attorney Richard B. Risk, Jr., who explained it to her.

46.     AIG, directly and through AIG Domestic Claims, on behalf of AIG's Lexington Insurance Company and other representatives of AIG, made a false representation as a statement of fact to Norma through her attorney, orally and in writing, that she would receive periodic payments costing $100,000 in settlement of her claims. That representation was false at the time that it was made because AIG did not intend at the time to fulfill its promise of purchasing periodic payments costing $100,000. Rather, pursuant to its uniform policy, practice, and procedure, AIG intended at the time to retain or use for its own benefit 4% of the $100,000, or $4,000. AIG made the false representation in order to induce Norma to act upon it by settling her claims against AIG's Lexington. Norma, in fact, acted upon the false representation to her detriment and financial injury by receiving less than the settlement amount she had been promised and to which she had agreed.

47.     By making affirmative statements to Norma through her representatives about how her settlement would be structured, AIG directly and through Lexington Insurance Company and other representatives, assumed a duty to disclose all other information relating to the structure. Moreover, in order to make its affirmative representation complete and not misleading, AIG owed a duty to disclose the hidden amount that it was retaining for itself or for the benefit of others. Even though AIG had this duty, it failed to make full and fair disclosure regarding the structure to Norma or her representatives, especially by failing to disclose that AIG would retain for itself or use for its own benefit 4% of the $100,000, and that Norma was getting a settlement with a cost or present value of future payments worth less than $100,000.

010654-11 921383 V1

48.     AIG benefited by the structured settlement transaction with Norma in the amount of at least 4% of $100,000, or $4,000, because AIG, pursuant to its uniform policy, practice, and procedure, retained for itself or used for its own benefit $4,000 and used only the remaining $96,000 for Norma's benefit. AIG unjustly and fraudulently failed to direct towards the purchase of an annuity for Norma the full $100,000 that had been promised and agreed to. The terms of Norma's settlement do not bar recovery in unjust enrichment or fraud for Norma, because recovery of the $4,000 that should have been used to purchase or fund an annuity is consistent with the collective terms of the agreement, including but not limited to the Settlement Memorandum, the Uniform Qualified Assignment and its Addendum No. 1, the American General Life Insurance Company Single Premium Immediate Annuity Policy, and the AGC Life Insurance Company Corporate Guarantee.

### 2.     Leonard M. Whitley, Jr.

49.     Leonard M. Whitley, Jr., a resident of Aberdeen, Mississippi, compromised his wrongful death claim and/or his claim against the proceeds of the Estate of Odessa Ware, his aunt, at the same mediation on April 22, 2003, in Tupelo, Mississippi, described above, which was also attended by his sister, Norma Ezell, Administratrix of the estate, and others named above. While the claim against Community Eldercare Services, L.L.C., and CLC of West Point, L.L.C., had been brought by his sister, Leonard's claims were settled along with his sister's. He was represented by the same attorney, J.P. Sawyer, who represented his sister and the estate of their aunt. Leonard M. Whitley, Jr., is no longer a client of J.P. Sawyer or his firm, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.

50.     The terms of his settlement included periodic payments in the total amount of $200,000, to be funded through the purchase of annuities, which the siblings agreed to divide equally to fund periodic payments in equal amounts and on identical dates. The annuity to fund

future payments to Leonard Whitley, which was supposed to cost or have a present value of $100,000, was issued by AIG's American General Life Insurance Company, dated May 6, 2003, to AIG's American General Annuity Service Corporation as its owner, which had accepted the defendant's obligation to make forty equal periodic payments of a specified amount each, beginning June 15, 2023, pursuant to a "qualified assignment" within the meaning of 26 U.S.C. § 130. Payments were guaranteed by AGC Life Insurance Company under a Corporate Guarantee. The annuity policy (Contract Number 4121321), was "signed at the home office on the date of issue" by American General Life Insurance Company's secretary and its president (signatures illegible). The single premium annuity policy's schedule page represented its cost to be "$10.00 and other valuable consideration," an obviously deceptive act to obfuscate the true cost to AIG P&C of the annuity, avoiding disclosure that its cost through an elaborate scheme of fraud to be described herein, perpetrated by a racketeering enterprise coordinated by AIG P&C, was less than his half of the $200,000 amount its claims representative had promised at the mediation, as reflected in the Settlement Memorandum, to which he signed as a party.

51.     Leonard M. Whitley, Jr., was unaware that the amount promised by AIG to go toward his future payments included a commission that would be paid to someone being rewarded by AIG for working on behalf of AIG to settle the claim against one of its subsidiary insurance companies. Leonard did not know that all or part of 4% of the $100,000 annuity premium—the sum of $4,000—was to be paid to the AIG Approved Broker, Jim Beatty, through an elaborate marketing system where others shared in these ill-gotten gains, including his agency (EPS Settlements) and perhaps even AIG's In-House agency. None of those who shared in that commission acted for his benefit. All participants who received part of the commission were loyal to AIG P&C—not to Leonard. He had been led by AIG to expect the benefit of $100,000 in

- 23 -

future payments from the annuity in exchange for compromising his claims against Lexington's insured tortfeasor. Instead, he received the benefit of only $96,000 as a result of AIG's fraudulent scheme. He was cheated out of $4,000. The amount paid by AIG to the AIG Approved Broker—whatever was left of the $4,000 after anything AIG may have kept for itself—was a cost of litigation that should have been borne by AIG, not the settling claimant. Instead, AIG induced Leonard to compromise his claims by accepting a promise of future payments having a specified cost or present value—an amount that included money AIG secretly intended to use to pay its own consultant. Leonard first learned of this scheme of fraudulent concealment on November 11, 2015, when he met in Tupelo, Mississippi, with Attorney Richard B. Risk, Jr., who explained it to him.

52.     AIG, directly and through AIG Domestic Claims, on behalf of AIG's Lexington Insurance Company and other representatives of AIG, made a false representation as a statement of fact to Leonard through his attorney, orally and in writing, that he would receive periodic payments costing $100,000 in settlement of his claims. That representation was false at the time that it was made because AIG did not intend at the time to fulfill its promise of purchasing periodic payments costing $100,000. Rather, pursuant to its uniform policy, practice, and procedure, AIG intended at the time to retain or use for its own benefit at least four percent of the $100,000, or $4,000. AIG made the false representation in order to induce Leonard to act upon it by settling his claims against AIG's Lexington. Leonard, in fact, acted upon the false representation to his detriment and financial injury by receiving less than the settlement amount that he had been promised and to which he had agreed.

53.     By making affirmative statements to Leonard through his representatives about how his settlement would be structured, AIG directly and through Lexington Insurance Company

and other representatives, assumed a duty to disclose all other information relating to the structure. Moreover, in order to make its affirmative representation complete and not misleading, AIG owed a duty to disclose the hidden amount that it was retaining for itself. Even though AIG had this duty, it failed to make full and fair disclosure regarding the structure to Leonard or his representatives, especially by failing to disclose that AIG would retain for itself or use for its own benefit 4% of the $100,000, and that Leonard was getting a settlement with a cost or present value of future payments worth less than $100,000.

54.     AIG benefited by the structured settlement transaction with Leonard in the amount of at least 4% of $100,000, or $4,000, because AIG, pursuant to its uniform policy, practice, and procedure, retained for itself or used for its own benefit $4,000 and used only the remaining $96,000 for Leonard's benefit. AIG unjustly and fraudulently failed to direct towards the purchase of an annuity for Leonard the full $100,000 that had been promised and agreed to. The terms of Leonard's settlement do not bar recovery in unjust enrichment or fraud for Leonard, because recovery of the $4,000 that should have been used to purchase or fund an annuity is consistent with the collective terms of the agreement, including but not limited to the Settlement Memorandum, the Uniform Qualified Assignment and its Addendum No. 1, the American General Life Insurance Company Single Premium Immediate Annuity Policy, and the AGC Life Insurance Company Corporate Guarantee.

### 3.      Erica Biddings (formerly Erica Major)

55.     Plaintiff Erica Biddings (formerly Erica Major), a resident of Florida, as Personal Representative of the Estate of Roddy Major, her husband, and personally, compromised wrongful death and personal injury claims against Bull Motors, LLC, doing business as Maroone Ford of Miami, which was insured by AIG's Lexington Insurance Company, through a Settle-ment Agreement and Release dated August 13, 2009, governed by Florida law. Erica had filed an

action in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County,

Florida, Case No. 04-16496, alleging negligence by the Defendant (Bull Motors, LLC, doing

business as Maroone Ford of Miami). In the Complaint, Erica sought to recover monetary

damages as a result of a motor vehicle accident on or about December 7, 2003, in Palm Beach

County, Florida, which resulted in the death of Roddy Major (her husband) and in personal

physical injuries to herself. Lexington Insurance Company, an affiliate of AIG, was the liability

insurer of Maroone Ford and, as such, was obligated to pay any claim made or judgment

obtained against them that was covered by its policy with Bull Motors, LLC, doing business as

Maroone Ford. The Settlement Agreement and Release was signed by Erica, by her attorney at

that time, Joseph Slama, Esq., by Coleman Edmunds, assistant secretary on behalf of Bull

Motors, LLC, and by an "authorized representative" of Lexington Insurance Company whose

name is illegible. Erica is no longer a client of Joseph Slama or his firm, Krupnick, Campbell,

Malone, Buser, Slama & Hancock, P.A.

56.     The settlement terms provided for specified cash amounts payable to the estate's

trust account and another to her attorneys, plus periodic payments "made or caused to be made

by Lexington Insurance Company," at an agreed total "present value" of $1,642,000, to be divi-

ded among three life insurance companies. The three life insurance companies that would each

issue an annuity, followed in parentheses by their related entity that would assume the obligation

to make the future payments, and the contract designation, are: Allstate Life Insurance Company

(Allstate Assignment Company), SSAL27510A; Hartford Life Insurance Company (Hartford

Comprehensive Employee Benefit Service Company), CCX0228871; and New York Life Insur-

ance Company (New York Life Insurance & Annuity Corporation), FP220028. Each annuity

would be owned by the respective entity of the issuing life insurance company that would

assume the periodic payment liability, by consent of the Plaintiff, under a "qualified assignment" pursuant to 26 U.S.C. § 130. None of these annuity issuers or assigned obligors is a defendant in this Complaint. The Settlement Agreement and Release did not state how the $1,642,000 would be allocated, which was part of AIG Lexington's ploy to obscure the fact that the sum of the true cost to AIG P&C of these annuities would be less than $1,642,000 through the same elaborate scheme of fraud employed in the settlements with Norma Ezell and Leonard Whitley, perpetrated by a racketeering enterprise coordinated by AIG P&C. That was not the true cost to AIG P&C, because all or part of the 4% commission bundled into that figure was paid to AIG P&C's confederate Agency Partner in the racketeering enterprise, which benefitted AIG and not the settling plaintiff, as will be detailed herein.

57.     A package of settlement documents was mailed to the plaintiff's attorney, Joseph Slama, Esq., on January 18, 2010, by Linda Stevenson of Black, Holcomb, Smith & Associates, Inc., which was an AIG Agency Partner, and subsequently forwarded to the plaintiff. Douglass "Chuck" Smith, the AIG Approved Broker who dealt directly with the plaintiff to process the structured settlement transaction, was a named partner with Black, Holcomb, Smith & Associates, Inc., which apparently was affiliated with EPS Settlements Group, another AIG Agency Partner. The Application for Structured Payments submitted to Allstate, dated October 7, 2009, was incorporated as part of the annuity contract. The application, which was signed by Joseph M. Costello for EPS Settlements Group, an AIG Approved Brokerage and part of the racketeering enterprise coordinated by AIG P&C, deceptively described the annuity's cost or present value as "$1 + valuable premium." (In a letter dated October 8, 2009, from "Payout Annuities" addressed to Erica Major, Allstate represented "the amount of the premium payable to the annuity issuer" as $670,755.00. However, even that is an overstatement of AIG P&C's actual cost, as will be

explained.) Hartford Life described the premium of the annuity it issued as "Paid in Full." New York Life described the premium paid to it as "$1 Plus Valuable Consideration."

58.     Erica Biddings was unaware that the amount promised by AIG to go toward her future payments included a commission that would be paid to someone being rewarded by AIG for working on behalf of AIG to settle the claim against one of its subsidiary insurance companies. Erica did not know that all or part of 4% of the combined $1,642,000 annuity premium—the sum of $65,680—was to be paid to the AIG Approved Broker, Douglas "Chuck" Smith, through an elaborate marketing system where others share in these ill-gotten gains, including his agency (Black, Holcomb, Smith & Associates, Inc.) and any other party in the chain, such as EPS Settlements, and perhaps even AIG's In-House agency. None of those who shared in that commission were involved for her benefit. All participants who received part of the commission were loyal to AIG P&C—not to Erica. She had been led by AIG to expect the benefit of $1,642,000 in future payments from the three annuities in exchange for compromising her claims against Lexington's insured tortfeasor. Instead, she received the benefit of only $1,576,320 as a result of AIG's fraudulent scheme. She was cheated out of $65,680. The amount paid by AIG to its Approved Broker—whatever was left of the $65,680 after anything AIG may have kept for itself—was a cost of litigation that should have been borne by AIG, not the settling claimant. Instead, AIG induced Erica to compromise her claims by accepting a promise of future payments having a specified cost or present value—an amount that included money AIG secretly intended to use to pay its own consultant. Erica first learned of this scheme of fraudulent concealment on September 23, 2015, when she met in Weston, Florida, with Attorney Richard B. Risk, Jr., who explained it to her.

59.     AIG, directly and through AIG Domestic Claims, on behalf of AIG's Lexington Insurance Company and other representatives of AIG, made a false representation as a statement of fact to Erica through her attorney, orally and in writing, that she would receive periodic payments costing $1,642,000 in settlement of her claims. That representation was false at the time that it was made because AIG did not intend at the time to fulfill its promise of purchasing periodic payments costing $1,642,000. Rather, pursuant to its uniform policy, practice, and procedure, AIG intended at the time to retain or use for its own benefit at least 4% of the $1,642,000, or $65,680. AIG made the false representation in order to induce Erica to act upon it by settling her claims against AIG's Lexington. Erica, in fact, acted upon the false representation to her detriment and financial injury by receiving less than the settlement amount that she had been promised and to which she had agreed.

60.     By making affirmative statements to Erica through her representatives about how her settlement would be structured, AIG (directly and through Lexington Insurance Company and other representatives) assumed a duty to disclose all other information relating to the structure. And in order to make its affirmative representation complete and not misleading, AIG owed a duty to disclose the hidden amount that it was retaining for itself. Even though AIG had this duty, it failed to make full and fair disclosure regarding the structure to Erica or her representatives, especially by failing to disclose that AIG would retain for itself or use for its own benefit 4% of the $1,642,000, and that Norma was getting a settlement with a cost or present value of future payments worth less than $1,642,000.

61.     AIG benefited by the structured settlement transaction with Norma in the amount of at least 4% of $1,642,000, or $65,680, because AIG, pursuant to its uniform policy, practice and procedure, retained for itself or used for its own benefit $65,680 and used only the remaining

$1,576,320 for Norma's benefit. AIG unjustly and fraudulently failed to direct towards the purchase of an annuity for Erica the full $1,642,000 that had been promised and agreed to. The terms of Erica's settlement do not bar recovery in unjust enrichment or fraud for Erica, because recovery of the $65,680 that should have been used to purchase or fund an annuity is consistent with the collective terms of the agreement, including but not limited to: the Settlement Agreement and Release dated August 13, 2009; the Uniform Qualified Assignment dated August 21, 2009, from Lexington Insurance Company to Allstate Assignment Company specifying Allstate Life Insurance Company as the annuity issuer, including Addendum No. 1; the Application to Allstate Assignment Company for Structured Payments; the Allstate Life Insurance Company Single Premium Immediate Certain Annuity policy SSAL27510A, issued August 21, 2009; the Statement of Guarantee issued by Allstate Life Insurance Company; the Uniform Qualified Assignment dated August 27, 2009, by Lexington Insurance Company to Hartford Comprehensive Employee Benefit Service Company specifying Hartford Life Insurance Company as the annuity issuer, including its Addendum No. 1; the Application to Hartford Life Insurance Company for Annuity dated September 4, 2009; the Single Premium Life Annuity with Certain Period dated December 7, 2009, policy number CCX0228871; the Hartford Evidence of Guarantee; the Uniform Qualified Assignment from Lexington Insurance Company to New York Life Insurance & Annuity Corporation specifying New York Life Insurance Company as the annuity issuer, including its Addendum No. 1; the Application for Structured Settlement to New York Life Insurance Company; the New York Life annuity policy number FP220028; and, the New York Life Insurance Company Guarantee.

**E.     Common Course of Conduct and Injury Allegations**

62.     Each of the structured settlements between Defendants and Plaintiffs and the other members of the Class was entered into under materially false and misleading circum-

stances, and each settlement agreement was breached by Defendants in an identical manner pursuant to Defendants' overarching scheme to short-change personal injury claimants' settlement recoveries.

63.     Each of Defendants' structured settlements with Plaintiffs and the other members of the proposed Class included a cash payment to which the settling parties had agreed, and which the AIG Company specifically represented, would be the full amount AIG would invest to purchase and fund an annuity. In other words, AIG adopted and followed a uniform practice of representing that the cost or present value of the annuity to be purchased would equal the specific sum allocated under the settlement to pay for future periodic payments.

64.     In conjunction with this standard representation made to all claimants, it was Defendants' practice to fail to disclose to Plaintiffs and other members of the Class numerous material facts concerning how AIG conducted its Structured Settlement Program including, among other things, that:

a.     Defendants participated in a short-changing scheme designed to allow them to recover the cost of their own structured settlement brokers, by deducting the brokers' fees from that portion of the settlement that the settling parties had previously agreed would be one hundred percent (100%) invested in future payments;

b.     Defendants accomplished this "short-change" by bundling the amount of the broker's commission—namely, four percent (4%)—into the illustrated annuity cost;

c.     Even when the broker's fee was not 4%, AIG would keep for itself whatever portion of the commission was not paid to the broker; and,

d.     As a result of the scheme undertaken by Defendants, the actual financial value of the settlement was materially lower than the value represented to injury

claimants since four percent (4%) of the full amount of cash to be invested in annuity

was, in fact, diverted by AIG to pay for its own Approved Brokers and In-House Brokers.

65.     Because it was Defendants' practice to fail to disclose that four percent (4%) of

the annuity investment amount was being subtracted by AIG to pay for its own brokerage costs

(or to be kept for itself when not paid to the broker), AIG's uniform representation of the actual

monetary value of each settlement—as a single number or aggregate of single numbers repre-

sented to the claimant—was materially false, misleading, and deceptive. In addition, because the

annuity software and quoting system includes the broker's commission as part of the premium

charge, AIG's uniform representation that the illustrated payments are reflective of the true

monetary value of the settlement agreement is also false, misleading, and deceptive.

66.     Defendants might argue that, because there is a 4% commission built into the

pricing formula of every structured settlement annuity that is paid to someone, regardless of

whom they represent, the settling claimant is not harmed. But there is a marked difference

between a commission being paid to a broker retained by and loyal to a claimant than to a broker

working on behalf of defendants or defendants' liability or casualty insurer. A broker

representing a defendant or insurer seeks to resolve the claim at the lowest possible cost to that

defendant or insurer, and that broker is released from any residual liability to the settling

claimant as an agent of the released tortfeasor or respondent employer. The claimant, who has

accepted a settlement on the basis that the defendant or its insurer will spend a defined amount in

exchange for a release of liability, is unwittingly duped into paying the fee of the person who

provides services on behalf of and for the benefit of the opposing party. If the settling claimant

had selected the broker, who would have a duty of loyalty to that claimant and who would not be

released from future liability for actions pertaining to the settlement, the broker would have

disclosed the amount and recipient of commissions and any other charges to the claimant, with an explanation as to how these charges are calculated, and the claimant's broker would not be obligated to steer the annuity placement to the affiliated life insurance company for the purchase of the annuity, allowing the claimant to benefit from free-market competition if the broker shops for the best and most suitable deal available to the claimant.

67.     Defendant AIG's conduct as set forth herein, in concealing the four percent (4%) brokerage cost and/or other charges, was intended to and had the effect of preventing Plaintiffs and other claimants with whom Defendants AIG (and its subsidiaries and affiliates) were settling from learning of Defendant AIG's wrongful conduct and of the causes of action against Defendant AIG for such wrongful conduct. To date, Defendant AIG has persisted in carrying out its wrongful scheme, and as a result, it continues to reap millions of dollars in unlawful profits.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

68.     Plaintiffs and Class members had no way of knowing about Defendants' scheme with respect to the four percent (4%) payment to AIG Approved Brokers.

69.     Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered, through the exercise of reasonable diligence, that Defendants were concealing the conduct complained of herein and misrepresenting the true amounts they would receive.

70.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that the AIG Defendants did not report information within its knowledge to federal and state authorities or consumers; nor would a reasonable and diligent investigation have disclosed that the AIG Defendants had concealed information which was discovered by Plaintiffs only shortly before this action was filed.

71.     For these reasons, all applicable statutes of limitation have been tolled by opera-

tion of the discovery rule.

**B.      Fraudulent Concealment Tolling**

72.     All applicable statutes of limitation have also been tolled by Defendants' knowing

and active fraudulent concealment and denial of the facts alleged herein throughout the period

relevant to this action.

73.     During the relevant statute of limitations period, Plaintiffs had neither actual nor

constructive knowledge of the pertinent facts constituting their claims for relief asserted herein.

Plaintiffs and other members of the Class did not discover, and could not have discovered

through the exercise of reasonable diligence, the existence of the conspiracy.

74.     Defendants took many steps to conceal the scheme from Plaintiffs and Class

members. Defendants not only guarded their conspiratorial communications to keep them from

coming to light but also affirmatively misled Plaintiffs and the Class members as to how their

secret commission scheme effected their annuity. They made these misstatements in a variety of

forms, including direct communications with Plaintiffs and Class members.

## VII.    CLASS ACTION ALLEGATIONS

75.     Under Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of

themselves and as representatives of the following proposed Class:

> All persons, whether or not insured by American International
> Group, Inc., or any of its subsidiaries (collectively, "AIG"), (1)
> who entered into a settlement as a claimant with AIG (or a person
> or entity insured by AIG), including AIG's predecessors, subsidi-
> aries, affiliates, successors, and assigns, between the date that AIG
> first offered structured settlements to claimants until the present,
> (2) in which some or all of the settlement amount was paid in fu-
> ture periodic payments funded with an annuity from either AIG or
> another life insurance company (but paid in either event by AIG),
> with such future payments coming from a transaction handled by
> AIG or an AIG Approved Broker, (3) where the amount that AIG

- 34 -

would invest to fund the annuity was represented in writing by AIG or an agent or representative of AIG, (4) where no independent broker was retained by the claimant to represent his or her interest in transacting the future payments, and (5) where only ninety-six percent (96%) of the specified investment amount was used to fund the future payments. This class includes attorneys who represented a class member described in the preceding sentence and who accepted any part of their fee for such representation funded by an annuity under the same circumstances as for the claimant. Excluded from the class are defendants and their corporate parents, subsidiaries, and affiliates; any person controlled by any excluded persons; and employees, agents, legal representatives, heirs, successors, and assigns of any excluded person. Also excluded from this class are persons who were represented by a plaintiff's broker in connection with the settlement, plaintiffs' counsel in this action, judges who approved structured settlements from annuities funded in whole or in part by an AIG affiliate, and judges to whom this case is assigned, including their staffs.

76.     This action meets all of the requirements of Federal Rule of Civil Procedure 23 because:

a.     Although Plaintiffs do not presently know the exact size of the Class since such information is in the exclusive control of Defendants, based on the nature of the activities alleged herein, Plaintiffs believe that the members of the Class number at least in the thousands, are geographically dispersed throughout Massachusetts and elsewhere, and are so numerous that joinder of all members is impracticable;

b.     Plaintiffs can and will fairly and adequately represent and protect the interests of the Class and have no interests which conflict with, or are antagonistic to, the interests of other Class members;

c.     Plaintiffs are represented by counsel experienced in class actions and complex civil litigation so as to ensure the adequate representation of absent Class members;

- 35 -

d.      Plaintiffs' claims are typical of those of all members of the Class in that, among other things, Plaintiffs and all members of the Class were similarly harmed by Defendants' misconduct;

e.      Questions of law and fact arising out of Defendants' conduct are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class;

f.      A class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted herein; and

g.      This class action is maintainable under Federal Rule of Civil Procedure 23(b) because the prerequisites of subdivision (a) are satisfied and, although only one of the following need apply in order for a class action to be maintainable, all of the following apply in this case:

1.      The prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants;

2.      The prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

3.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

4.      Questions of law or fact common to the members of the Class predominate over any questions affecting

only individual members, making a class action
superior to other available methods for the fair and
efficient adjudication of the controversy.

77.     The predominance requirement is satisfied for all causes of action because the

issues in common to the members of the Class are not overshadowed by individualized issues.

## VIII.   CAUSES OF ACTION

### COUNT I

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c) AND 18 U.S.C. § 1962(d)

### (AGAINST ALL DEFENDANTS)

78.     Plaintiffs incorporate by reference the allegations set forth above as if fully set

forth herein.

**A.     The Racketeering Enterprise**

79.     Defendants, together with the brokers participating in the AIG Approved Broker

program, formed an association-in-fact for the purpose of conducting AIG's intra-company

structured settlement transactions, maximizing their respective profits in the process, and used

this association-in-fact to defraud Plaintiffs and members of the Class. This association-in-fact

constitutes an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

80.     This enterprise was engaged in, and its activities affected, interstate commerce

within the meaning of RICO, 18 U.S.C § 1962(c).

81.     Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3), and are

legally distinct from the enterprise.

82.     Defendants unlawfully, knowingly, and intentionally conducted and participated,

directly and/or indirectly, in the conduct of the enterprise's affairs through a "pattern of

racketeering activity" within the meaning of RICO, 18 U.S.C § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

**B.      Racketeering Activity and Predicate Acts**

83.      Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C § 1961(1) by engaging in acts that constitute a violation of one or both of the following statutes: 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C § 1343 (wire fraud).

84.      Defendants, together with the brokers participating in the AIG Approved Broker program, each committed and/or aided and abetted the commission of significantly more than two of these acts of "racketeering activity," which continued for a period of at least 14 years between 2002 and the present; other acts are continuing and threaten to continue indefinitely. These predicate acts are chargeable and indictable, as required under 18 U.S.C. § 1961(1).

85.      Defendants, through the use of interstate mails and delivery services (within the meaning of 18 U.S.C. § 1341) and through the use of interstate wires (within the meaning of 18 U.S.C. § 1343), knowingly and intentionally participated in misrepresenting the present value of the settlement or portion being structured, or the cost or amount to be used to fund the structure, or falsely represented that the structure would be at no cost to Plaintiffs and members of the Class, and knowingly and intentionally failed to fully and fairly disclose to Plaintiffs and Class members that AIG was directly or indirectly benefitting from 4% or more of the amount that had been promised or agreed upon for the structure, even though Defendants assumed and/or owed a duty to Plaintiffs and members of the Class to disclose all information relating to their structured settlements.

86.      As alleged herein, the present value of the settlement or portion being structured, the cost or the amount to be used to fund the structure, and whether the claimant would incur costs for the structure were material elements in the formation of the settlements between AIG

and its subsidiaries, on the one hand, and Plaintiffs and members of the Class, on the other hand.

Plaintiffs and Class members reasonably relied, to their detriment, upon the aforementioned

uniform misrepresentations and omissions in entering into the settlements at issue, which

misrepresentations and omissions occurred in every structured settlement with Plaintiffs and

members of the Class.

87.     Defendants, together with the brokers participating in the AIG Approved Broker

program, made extensive use of interstate mails and wires to, among other things:

      a.      Form and maintain the RICO enterprise;

      b.      Distribute annuity quoting and marketing materials;

      c.      Distribute annuity rate updates;

      d.      Assign cases;

      e.      Devise and implement strategies and marketing presentations for structured settlements;

      f.      Present annuity quotes;

      g.      Transmit case information when negotiating and consummating a structured settlement;

      h.      Transmit funds for the purchase of annuities;

      i.      Transmit and file settlement documents, including, without limitation, court-ordered and approved settlements with minors and workers' compensation claimants; and

      j.      Make scheduled periodic payments to or for the benefit of Plaintiffs and members of the Class.

88.     With respect to Plaintiff Norma Ezell, predicate acts include the following, among

other things:

      a.      On or about April 22, 2003, after participating as AIG's representative at

the mediation that resulted in the Settlement Memorandum, Tom Senderhauf

communicated settlement terms by wire and/or mail to Jim Beatty of EPS Settlements, an

AIG Approved Broker from Duluth, Georgia, selected by Lexington to arrange for future payments. Senderhauf was an AIG Technical Services claims analyst who negotiated and settled high-exposure claims for the nursing home industry. Beatty was present during the mediation; the wire and/or mail exchanges were follow-up matters, which discussed Beatty's role to devise structured settlement proposals to present to Norma. Senderhauf and Beatty knew that the cost of Norma's share of the annuity allocation was represented to her as $100,000, and both knew that 4% of that amount would be paid in commissions to Beatty, among others, a secret they kept from Norma.

  b.  The commissions would be paid by wire and/or mail by the annuity issuer, AIG American General Life, to EPS Settlements, which in turn would pay Jim Beatty his share by wire and/or mail. AIG P&C had received the services of EPS Settlements and Jim Beatty at no cost to AIG, because it used a portion of the amount promised to Norma Ezell in exchange for her release of claims to pay for the services.

  c.  Subsequently, Jim Beatty prepared structured settlement proposals for Norma, using wire and/or mail to present them and arrange a meeting to obtain her choice of a payout schedule and have her complete and sign an Information Request Form. That form, dated May 1, 2003, along with the annuity application, Uniform Qualified Assignment, and other documents necessary to complete the structured settlement, were transmitted by wire to EPS Settlements, where they were signed by Joseph M. Costello, an officer of that company.

  d.  On or about February 17, 2004, EPS Settlements submitted the Information Request Form by wire and/or mail to American General Life in Amarillo, Texas, where it was acknowledged by Bobby Steele, an officer of the company at that time.

e.      Before March 29, 2004, AIG sent a package by mail to J.P. Sawyer, Norma's attorney at that time, containing a copy of the annuity policy representing the settlement payments Norma was to receive, plus copies of other documents relevant to the settlement and annuity policy. In turn, these were forwarded to Norma by her attorney. These transactions demonstrate how AIG uses wire and mail as part of its overall scheme to defraud Plaintiffs and members of the putative class.

89.     With respect to Leonard M. Whitley, Jr., predicate acts include the following, among other things:

a.      On or about April 22, 2003, Tom Senderhauf, following his participation as AIG's representative at the mediation that resulted in the Settlement Memorandum, communicated settlement terms by wire and/or mail with Jim Beatty of EPS Settlements, an AIG Approved Broker from Duluth, Georgia, selected by Lexington to handle the arrangement for the future payments in this case. Senderhauf was an AIG Technical Services claims analyst whose specialty was to negotiate and settle high exposure claims for the nursing home industry. Beatty was present during the mediation; the wire and/or mail exchanges were follow-up matters. They discussed Beatty's role to devise structured settlement proposals to present to Leonard. Both Senderhauf and Beatty knew that the cost of Leonard's share of the annuity allocation was represented to him as $100,000, while they also both knew that 4% of that amount would be paid in commissions to Beatty, among others, a secret they would keep from Leonard.

b.      The commissions would be paid by the annuity issuer, AIG American General Life, to EPS Settlements by wire and/or mail, which in turn would pay Jim Beatty (of EPS) his share by wire and/or mail. AIG P&C had received the services of

EPS Settlements and Jim Beatty at no cost to AIG because it used a portion of the amount promised to Leonard Whitley in exchange for his release of claims to pay for the services.

c.      Subsequently, Jim Beatty prepared structured settlement proposals for Leonard, using wire and/or mail to present them and arrange a meeting to obtain his choice of a payout schedule and have him complete and sign an Information Request Form. That form, dated May 1, 2003, along with the annuity application, Uniform Qualified Assignment, and other documents necessary to complete the structured settlement, were transmitted by wire to EPS Settlements, where they were signed by Joseph M. Costello, an officer of that company.

d.      On or about February 17, 2004, EPS submitted the Information Request Form by wire and/or mail to American General Life in Amarillo, Texas, where it was acknowledged by Bobby Steele, an officer of that company at that time.

e.      Prior to March 29, 2004, AIG sent a package by mail to J.P. Sawyer, Leonard's attorney at that time, containing a copy of the annuity policy representing the settlement payments Leonard was to receive, plus copies of other documents relevant to the settlement and annuity policy. In turn, these were forwarded to Leonard by his attorney. These transactions demonstrate how AIG uses wire and mail as part of its overall scheme to defraud Plaintiffs and members of the putative class.

90.      With respect to plaintiff Erica Biddings, predicate acts include the following, among other things:

a.      Prior to August 13, 2009, a claims representative for Defendant Lexington Insurance Company, an AIG company, communicated with Joseph J. Slama, Erica's attorney, by wire and/or mail, to negotiate a resolution of her claims against their insured,

Bull Motors, LLC, and the dismissal of her lawsuit. These negotiations resulted in a mutually acceptable amount that AIG would pay to her and her attorney, plus an amount that would be paid to the respective assignment entities of three life insurance companies (Allstate, Hartford, and New York) to establish streams of future payments funded by annuities. An AIG Approved Broker, Douglas "Chuck" Smith, of AIG's "Agency Partner" Black, Holcomb, Smith & Associates, Ft. Lauderdale, Florida, which was affiliated with "Agency Partner" EPS Settlements, also participated in these wire and/or mail interactions, which culminated in the delivery of a Settlement Agreement and Release to Attorney Slama, to be signed by him and his client on August 13, 2009. It was signed on behalf of Defendant Bull Motors the next day, August 14, 2009, then sent by mail to be signed on behalf of Lexington Insurance Company. Smith and the Lexington representative communicated between them by wire and/or mail, both knowing that the amount represented to Erica in the Settlement Agreement and Release to be spent on annuities to fund future payments, $1,642,000, would not all be applied for her benefit, since 4% of that amount would go to pay a commission to Smith, among others, keeping that material fact a secret from Erica.

b.       Subsequently, Smith packaged the Settlement Agreement and Release along with several documents necessary to purchase the annuities from Allstate, Hartford, and New York life insurance companies and assign the payments to Erica, and mailed them to eventually be signed on behalf of Lexington for processing and issuance of payments to the three life insurance companies by wire and/or mail.

c.       Copies of the three annuity policies, along with qualified assignments and other related documents were sent by Allstate, Hartford, and New York life companies by

mail to Black, Holcomb, Smith & Associates, either directly or to EPS Settlements to be

forwarded. In turn, Black, Holcomb, Smith & Associates mailed the three sets of annuity

documents to Attorney Joseph J. Slama at Krupnick, Campbell, Malone, Buser, Slama,

Hancock, Liberman & McKee. On January 27, 2010, Slama then mailed the three packets

to Erica.

        d.     These transactions demonstrate how AIG uses wire and mail as part of its

overall scheme to defraud Plaintiffs and members of the putative class.

91.     All communications constituting mail and/or wire fraud were undertaken for the

purpose of executing Defendants' scheme to breach settlement agreements with claimants,

defraud claimants and/or unjustly enrich themselves, or have been incidental to that scheme,

which is ongoing.

92.     The predicate acts are common to Defendants' scheme to conduct the affairs of

the RICO enterprise, and the acts pose a continuing threat of racketeering activity.

93.     The racketeering activity was and is related by virtue of common participants,

common victims (Plaintiffs and Class members), a common method of commission, and the

common purpose and common result of breaching settlement agreements, defrauding claimants

and unjustly enriching AIG and its collaborators, at the expense of Plaintiffs and Class members,

while concealing these activities. Defendants' scheme has continued at least since August 2002,

when AIG purchased American General and made it the primary annuity issuer for its scheme

(except for New York cases), to the present and threatens to continue unless enjoined by this

action.

94.     The racketeering activity is distinct from the activities of the RICO enterprise.

The enterprise, as an association-in-fact, was formed to foster the sale of AIG's annuities, in

particular, the sale of annuities used in structured settlements, and to provide the brokers participating in the AIG Approved Broker program increased aggregate commissions.

95.     The AIG RICO defendants are all distinct corporate entities and, in turn, the AIG Approved Brokers are all entities distinct from one another (and from the AIG RICO defendants). There is no overlapping ownership or control. In fact, the AIG Approved Brokers compete for AIG's business, and each is free to act independently (and does) to advance its own interests contrary to that of the other AIG Approved Brokers. Further, each AIG Approved Broker has its own customer base; in this vein, so do AIG property and casualty insurers. The participants are thus not acting within the scope of a single corporate structure, guided by a single corporate consciousness.

96.     The racketeering activity was, and is, made possible by the existence of the RICO enterprise, and the cost savings to AIG and its subsidiaries that result from the racketeering activity enable the enterprise to profitably maintain its structure.

97.     As a direct and proximate result of the racketeering activity, Plaintiffs and members of the Class were induced to act upon the false representations of Defendants, to the detriment and financial injury of Plaintiffs and Class members.

## C.     Causation

98.     The injuries to Plaintiffs and members of the Class resulted from the racketeering activity:

        a.     <u>Transaction Causation</u>. Every Plaintiff and Class member bargained for a specified present value of their structured settlement and/or for a specified investment in the annuity to fund their future payments but were deprived of the full value.[4]

---

[4] For purposes of this Complaint, the terms "present value" and "cost" are interchangeable.

b.      Loss Causation. Defendants' uniform omissions, carried out systematically through the aforementioned predicate acts of mail fraud and/or wire fraud in connection with every structured settlement, caused the loss suffered by Plaintiffs and Class members, insofar as the present value of periodic payments made to them are 4% or more than the amount that they had been promised or agreed upon.

99.      As a result, Defendants are liable to Plaintiffs and Class members for their losses in an amount to be determined at trial.

100.      Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Class members are entitled to recover treble damages plus attorneys' fees from Defendants.

**D.      Violation of 18 U.S.C. § 1962(d)**

101.      As alleged above, AIG and its subsidiaries conspired and agreed with the brokers participating in the AIG Approved Broker program to conduct the scheme to breach settlement agreements and defraud claimants, in order to enhance AIG's profits and to cover its operating expenses, including commissions paid to the brokers participating in the AIG Approved Broker program, who ensured that the structured settlement transactions occurred within AIG's corporate structure, so that AIG could perpetuate this fraud.

102.      This conspiracy was orchestrated by Defendants and the brokers participating in the AIG Approved Broker program to facilitate the commission of a violation of Section 1962(c), which, in and of itself, constitutes a violation of 18 U.S.C. § 1962(d).

103.      Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Class members are entitled to recover treble damages, plus attorneys' fees from Defendants.

**COUNT II**

**FRAUD, FRAUDULENT CONCEALMENT, FRAUD IN THE INDUCEMENT, AND CONSPIRACY TO DEFRAUD**

**(AGAINST ALL DEFENDANTS)**

104.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

105.    One or more of Defendants or their representatives made false and misleading representations as statements of fact to Plaintiffs and Class members, and Defendants knew those representations to be false and misleading.

106.    By making affirmative statements regarding certain matters to Plaintiffs and Class members, Defendants assumed a duty to disclose all other information relating to those matters. Moreover, in order to make their affirmative representations complete and not misleading, Defendants owed a duty to disclose the hidden amounts that they were retaining for themselves. Even though Defendants had this duty, they failed to make full and fair disclosure to Plaintiffs and Class members.

107.    By deliberately hiding or suppressing the true cost to AIG of the annuities, through use of substitute terms in annuity applications and contracts such as "$1 plus valuable consideration," "valuable consideration," "paid in full," and the like, Defendants and the AIG Approved Brokers acting on behalf of Defendants intentionally deceived and defrauded Plaintiffs and the members of the Class of material facts which Defendants were legally bound to disclose.

108.    Defendants made the false and misleading representations to induce Plaintiffs and Class members to act upon the representations.

109.    Plaintiffs and the members of the Class acted upon the false representations of Defendants, to the detriment and financial injury of Plaintiffs and Class members.

110.    Plaintiffs have alleged herein the time, place, and contents of Defendants' false representations forming the basis of this claim, as well as the consequences thereof.

111.    As alleged in detail above, all Defendants conspired to defraud all Plaintiffs and all Class members.

112.    Defendants' conduct was wanton and willful and in reckless disregard of the rights of Plaintiffs and Class members, entitling them to be awarded punitive damages.

## COUNT III

## UNJUST ENRICHMENT

## (AGAINST AIG PARENT ONLY)

113.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

114.    Plaintiffs bring this claim against defendant AIG Parent only.

115.    AIG Parent was benefited by its uniform policy, pattern, and practice of deception and unjustly failed to pay the Plaintiffs or the members of the proposed class for those benefits.

116.    AIG Parent's failure to pay Plaintiffs or the members of the proposed class for those benefits was to the detriment of the Plaintiffs and the members of the proposed class.

117.    Plaintiffs and the members of the proposed class have no contractual remedy for AIG Parent's unjust enrichment, and the return of the benefits to the Plaintiffs and members of the class would not be inconsistent with any contracts between them and Defendants.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court enter:

(1)     An order determining that this action should be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

(2)     Judgment against Defendants, jointly and severally, in favor of Plaintiffs and the members of the Class as to Counts I through II of this Complaint for actual, compensatory, punitive, and statutory damages (including treble damages), and against AIG Parent in favor of Plaintiffs and the members of the Class as to Count III of this Complaint for actual, compensatory, and punitive damages (including treble damages);

(3)     An award of equitable relief requiring that Defendants be required to provide notice to any consumer whose claim is paid, resolved, settled, or funded through a structured settlement annuity, receive full and fair notice of any reductions in the value of the annuity through the payments of any commissions, as well as the amount of commissions being paid to any broker or the amount of any sums being retained by any Defendant, enjoining Defendants from engaging in similar unfair, unlawful, and deceptive acts in the future, requiring Defendants to make full restitution of all monies obtained or retained as a result of the wrongful conduct described in the complaint, and requiring Defendants to disgorge all ill-gotten gains flowing from the wrongful conduct described in this Complaint;

(4)     An award of attorneys' fees and costs and expenses; and

(5)     Judgment for any further relief that the Court considers just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues in the Complaint triable by a jury.

Dated: January 3, 2017

Respectfully submitted,

PLAINTIFFS NORMA EZELL, LEONARD WHITLEY, and ERICA BIDDINGS, on behalf of themselves and all others similarly situated

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Kristen A. Johnson*
    Kristen A. Johnson (BBO #667261)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
kristenj@hbsslaw.com

Steve W. Berman *(pro hac vice to be filed)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

and

Richard B. Risk, Jr. *(pro hac vice to be filed)*
RISK LAW FIRM, P.A.
6964 S. Shore Drive S.
South Pasadena, FL 33707-4603
Telephone: (727) 289-6696
dick@risklawfirm.com

010654-11 921383 V1